UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Esther Salas |
| | : | |
| v. | : | Mag. No. 10-7115 (ES) |
| | : | |
| ELIYAHU WEINSTEIN, | : | |
| a/k/a "Eli Weinstein," and | : | |
| VLADIMIR SIFOROV | : | **CRIMINAL COMPLAINT** |

I, Karl Ubellacker, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

_____
Karl Ubellacker, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
August 11, 2010 at Newark, New Jersey

HONORABLE ESTHER SALAS            _____
UNITED STATES MAGISTRATE JUDGE     Signature of Judicial Officer

## ATTACHMENT A

### Count 1

From in or about February 2006 through in or about March 2008, in the District of New Jersey, and elsewhere, defendant

**ELIYAHU WEINSTEIN,**
a/k/a "Eli Weinstein,"

did knowingly execute and attempt to execute a scheme and artifice to defraud a financial institution, namely "Victim 1," a financial institution based in Chicago, Illinois, and to obtain money, funds, and assets owned by and under the custody and control thereof, by means of materially false and fraudulent pretenses, representations, and promises.

In violation of Title 18, United States Code, Section 1344 and Section 2.

### Count 2

From in or about May 2007 through in or about October 2007, in the District of New Jersey, and elsewhere, defendants

**ELIYAHU WEINSTEIN,**
a/k/a "Eli Weinstein," and
**VLADIMIR SIFOROV**

having knowingly devised and attempted to devise a scheme and artifice to defraud an individual with the initials M.F., namely "Victim 2," and to obtain money or property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures and sounds.

In violation of Title 18, United States Code, Section 1343 and Section 2.

ATTACHMENT B

I, Karl Ubellacker, a Special Agent with the Federal Bureau of Investigation ("FBI"), having conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause:

**Background**

1. At all times relevant to this complaint:

    a. Defendant ELIYAHU WEINSTEIN, a/k/a "Eli Weinstein," was a resident of New Jersey, who purported to be a real-estate investor based in New Jersey, operating through several entities controlled by him, including an entity known as Pine Projects, LLC ("Pine Projects").

    b. Defendant VLADIMIR SIFOROV was a resident of New York, who purported to be a real estate investor as well as the owner of a trucking concern based in New York.

    c. M.G. was a resident of New Jersey and a partner with defendant WEINSTEIN in Pine Projects.

    d. Bank A, a bank headquartered in Chicago, Illinois ("Victim 1"), was a "financial institution" as defined in Title 18, United States Code, Section 20.

    e. M.F., a victim of defendants WEINSTEIN and SIFOROV, was a real estate investor based in England ("Victim 2").

**The Scheme to Defraud**

2. Beginning at least as early as September 2005 and continuing to the present, defendant WEINSTEIN has orchestrated and executed, with the help of others, a real estate investment fraud scheme resulting in losses of at least approximately $200 million.

3. In operating this scheme, defendant WEINSTEIN, a member of the Orthodox Jewish community, has targeted investors who are also members of the Orthodox Jewish community in New Jersey, New York, Florida, California and abroad. This community is tight-knit; its members are connected to one another from a young age through numerous types of social and religious bonds. Defendant WEINSTEIN has exploited the social and business customs and practices of this community in furtherance of his scheme. Defendant WEINSTEIN has used contacts within the community to be introduced to his victims, such as Victim 2. Defendant WEINSTEIN then has falsely represented to these victims that an entity he controls either owns or could purchase a particular parcel of real property. Defendant WEINSTEIN and others

encouraged their victims to invest in those properties.

4.     In furtherance of the scheme, defendant WEINSTEIN often has claimed to many of his victims that he already has a third party lined up to buy or rent the property, thereby enabling the investors to earn a healthy profit in a short time period. And to evade the need to record a deed (which he usually did not possess), defendant WEINSTEIN often falsely claimed that a special purpose entity, such as a limited-liability company ("LLC") owned the property in question. Defendant WEINSTEIN then structured his transactions such that he would sell shares of the LLC via a "share sale agreement" to his victims.

5.     In all cases, however, defendant WEINSTEIN and others, including defendant SIFOROV, have lied to their victims to induce their "investments." These lies took many forms. Some examples include that:

    a.     Defendant WEINSTEIN never owned most of the properties he claimed to own.

    b.     The "third party buyers" were often co-conspirators, such as defendant SIFOROV, not bona fide arms' length purchasers.

    c.     Defendant WEINSTEIN sold his real or fake interest in a single property multiple times, to different victims.

    d.     Defendant WEINSTEIN fraudulently altered checks that had been negotiated for small amounts to make it appear that they were worth millions of dollars.

    e.     Defendant WEINSTEIN presented copies of checks to his victims as having been negotiated that never were negotiated. Defendant WEINSTEIN has then used these fake checks to obtain money from his victims, including Victim 1.

    f.     Defendant WEINSTEIN drew up fraudulent leases to make it seem that a property had substantial rental income, when in fact there was no tenant and there was no income.

    g.     And defendant WEINSTEIN hid material information from his victims, such as profound zoning changes that would dramatically reduce the value of certain properties.

6.     When victim-investors sought to collect their earnings, or at least recoup their investment from defendant WEINSTEIN, he reacted in different ways: at times he would ignore them; other times he would tell them their money was forthcoming, and then not pay; and on some occasions he would pay a smaller amount. In one example, a victim-investor's representative went to defendant WEINSTEIN's home and demanded to speak with defendant WEINSTEIN about the victim-investor's investment. Defendant WEINSTEIN eventually came outside and asked the representative what the representative's wife and defendant WEINSTEIN "have in common." When the representative answered "I don't know," defendant WEINSTEIN replied "we both

fucked you."

## The Victim 1 Transaction

7. In or about September 2005, defendant WEINSTEIN and M.G. purported to enter into a contract to purchase property located at 1203-1209 DeKalb Avenue in Brooklyn, New York ("1209 DeKalb"). To conduct the purchase, on or about February 1, 2006, defendant WEINSTEIN and M.G. formed a limited liability company called Bushwick Enterprise Group ("BEG"). On or about February 2, 2006, defendant WEINSTEIN and M.G. executed an Operating Agreement for BEG (the "BEG Operating Agreement"). The BEG Operating Agreement specified that BEG's "registered agent shall be Eli Weinstein."

8. In or around February 2006, to finance BEG's purchase of 1209 DeKalb, defendant WEINSTEIN and M.G. sought a mortgage of approximately $6 million from Victim 1, a bank. Victim 1 agreed to loan the approximately $6 million to BEG, but only on the explicit condition that BEG would provide a significant portion of the purchase price through an equity contribution. Specifically, Victim 1 demanded that defendant WEINSTEIN and M.G., through BEG, provide approximately $2 million of their own cash to close the transaction. To further protect itself, Victim 1 insisted that there be no other mortgage on 1209 DeKalb other than Victim 1's mortgage.

9. Unbeknownst to Victim 1, however, defendant WEINSTEIN made arrangements with the sellers of 1209 DeKalb Avenue to provide a so-called "seller's second": an approximately $2 million loan from the sellers to Weinstein and M.G. for the balance of the purchase price, to be secured by a second mortgage on the property. According to a representative of the seller, defendant WEINSTEIN threatened that if the sellers did not agree to provide this loan, then defendant WEINSTEIN would tie up the property in litigation for years.

10. In or about March 2006, the 1209 DeKalb transaction closed. Defendant WEINSTEIN and others fraudulently induced Victim 1 to release the mortgage money by causing a fax to be sent to Victim 1's closing attorney. The fax purported to show two checks that BEG had written, for approximately $2.1 million, due from defendant WEINSTEIN and M.G. The checks appeared to have been drawn on the account of Pine Projects. The checks were fraudulent. Bank records have confirmed that neither check was ever deposited. In reliance on the fax relating to the never-deposited checks, Victim 1 released the approximately $6 million in mortgage money.

11. Defendant WEINSTEIN and BEG stopped making timely payments on the loan in or about October 2007. In addition, in or about December 2007, Victim 1 discovered the existence of the seller's second mortgage on 1209 DeKalb. On or about January 24, 2008, defendant WEINSTEIN and others met with a representative of Victim 1 in New York to discuss the loan. During this meeting, Weinstein admitted that he did not, in fact, invest any money at the closing because he had been unable to raise enough equity to complete the transaction. When the Victim 1 representative replied that the money was supposed to have come from Weinstein personally, not investors, Weinstein admitted in sum and substance: "You're right, we fucked you. Get over

3

it. Don't you wanna solve the problem?"

12.     Victim 1 has since commenced foreclosure proceedings on 1209 DeKalb.

### The Victim 2 Transaction

13.     Meanwhile, in or around May 2007, defendant WEINSTEIN approached Victim 2 and represented to Victim 2 that BEG owned 1209 DeKalb, and that defendant WEINSTEIN had a bona-fide purchaser for the property named "Siforov, Inc.," headed by defendant SIFOROV. Defedant SIFOROV, asserted defendant WEINSTEIN, was ready to buy 1209 DeKalb for approximately $16.2 million. To prove this to Victim 2, defendant WEINSTEIN, in or around Lakewood, New Jersey, caused to be faxed to Victim 2, in or around the United Kingdom, a "Share Sale Agreement" (the "1209 DeKalb SSA").

14.     The 1209 DeKalb SSA falsely asserted that defendant WEINSTEIN and M.G. owned all of the outstanding shares of BEG's stock and that defendant WEINSTEIN and M.G. had agreed to sell their shares of BEG stock to Siforov, Inc. for approximately $16.2 million. The 1209 DeKalb SSA purported to be signed by defendant WEINSTEIN, defendant SIFOROV, and M.G. Finally, the 1209 DeKalb SSA claimed that Siforov, Inc. was being represented by a certain attorney in New York, New York ("Attorney A").

15.     After receiving the 1209 DeKalb SSA, Victim 2, located in or around the United Kingdom, had a telephone conversation with defendant SIFOROV, located in or around New York, in which defendant SIFOROV falsely represented himself to be the intended purchaser of 1209 DeKalb.

16.     Then, based on the 1209 DeKalb SSA, the conversation with defendant SIFOROV, and Weinstein's connections in the Orthodox Jewish community, Victim 2 wired $4.8 million from an account Victim 2 controlled based outside of New Jersey to an account controlled by defendant WEINSTEIN in New Jersey, in exchange for 80% of the shares in BEG.

17.     The 1209 DeKalb SSA was a sham, and defendant SIFOROV's representations to Victim 2 were false. Defendant SIFOROV never intended to purchase 1209 DeKalb, and was defendant WEINSTEIN's confederate, not an arm's-length purchaser. Among other things:

    a.     A search of databases available to law enforcement revealed no evidence that an entity with the name "Siforov Inc." has ever been incorporated in any U.S. jurisdiction.

    b.     Attorney A has affirmed in a sworn affidavit that he "never represented Siforov, Inc. or Vladimir Siforov with regard to a share sale agreement that purports to sell shares of Bushwick Enterprise Group, LLC."

    c.     During a deposition taken on or about May 11, 2010, defendant SIFOROV testified

that Attorney A had been his lawyer "just once in 1999 for my green card" and that when he signed the 1209 DeKalb SSA, he had not retained Attorney A to represent him in the proposed transaction.

d. During the same deposition, defendant SIFOROV admitted that defendant WEINSTEIN was his "partner." Siforov also admitted that the 1209 DeKalb SSA "wasn't a real agreement" but rather was "an agreement of intentions." Defendant SIFOROV further admitted that Siforov Inc. "was never formed." And he admitted that he had never seen development plans, inquired about zoning or environmental issues, or engaged architects, engineers or title companies in connection with this purported real estate project. Instead, defendant SIFOROV testified that those were defendant WEINSTEIN's responsibilities, while defendant SIFOROV's "part was to find rich Russian people who were ready to invest in the safe zone of the United States of America."

e. The purported $16.2 million purchase price was also fabricated. Defendant SIFOROV has admitted: "That was just an agreement of intention. That's what [Weinstein] explained to me. Why should I care about the price[?] It wasn't like an agreement when you pay money." Moreover, Siforov Inc. itself was conjured as part of the scheme and artifice to defraud: defendant SIFOROV has admitted: "When I signed" the 1209 DeKalb SSA, "I ask[ed Weinstein] what this [was] all about. He said 'We are going to form the company, what do you think a good name would be[?] Do you think it is good if it is going to be your name on it[?]' My name is Siforov, Siforov, Inc., I said 'why not.' That's it."

f. A review of American Express billing statements has revealed that during 2005 and 2006, defendant SIFOROV charged approximately $350,000 to defendant WEINSTEIN's American Express account.

18. The 1209 DeKalb SSA falsely claimed that Siforov Inc. would fund its approximately $16.2 million purchase of 1209 DeKalb through an approximately $1 million down payment and approximately $15.2 million due at closing. In or around June 2007, to further effectuate the fraud, defendant WEINSTEIN directed the transfer of approximately $1 million through a bank account in the name of an entity with the initials V.L.K., and into the attorney trust account of B.H., defendant WEINSTEIN's attorney.

19. Defendant WEINSTEIN directed this transfer to make it appear as though defendant SIFOROV had deposited the approximately $1 million down payment, and that all was well with the transaction. But this money never belonged to defendant SIFOROV. Instead, defendant SIFOROV has testified under oath during a deposition that he had never heard of V.L.K. Moreover, just a few days after the initial transfer into the account of B.H., defendant WEINSTEIN and defendant SIFOROV directed B.H. – in writing – to withdraw the approximately $1 million from the attorney trust account and make the proceeds "payable to the

discretion of Eli Weinstein."

20.     In or around October 2007, to induce Victim 2 to invest more money, defendant WEINSTEIN misrepresented to Victim 2 that the transaction with defendant SIFOROV had closed. Defendant WEINSTEIN provided a copy of an approximately $9.9 million cashier's check to Victim 2, to "prove" that the deal had closed. Based on this misrepresentation and others, Victim 2 provided defendant WEINSTEIN approximately $1.7 million more. In fact, however, the check was never deposited. Moreover, the financial institution that purportedly issued this cashier's check has confirmed to law enforcement that the check presented to Victim 2 was counterfeit. The real cashier's check was for a different amount, issued on a different date, and payable to a different person (who had been defendant WEINSTEIN's partner in a used car business).

## Defendant WEINSTEIN's Proceeds and Plans

21.     The investigation has revealed that defendant WEINSTEIN has used some of his victims' investments to amass a substantial collection of art, jewelry and Judaica. These items include manuscripts and antique Judaica worth approximately $6.2 million; a jewelry and clock collection, which he admitted paying approximately $7.6 million to acquire; a substantial collection of jewelry and watches valued by defendant WEINSTEIN at more than approximately $6.2 million dollars, including items from such high-end jewelers and watchmakers as Breguet, Bulgari, Cartier, Omega, Patek Phillippe and Harry Winston. Moreover, American Express records show that during on or about December 24, 2004 through the present, approximately $1.7 million was charged to defendant WEINSTEIN-related accounts for transactions with jewelers, art dealers and Judaica dealers. The investigation has revealed that defendant WEINSTEIN has stored these items in, among other places, New Jersey, New York, Florida, and Israel.

22.     The investigation has also revealed that defendant WEINSTEIN has maintained multiple passports and, showing them to one of the victim-investors of his scheme, has stated, in sum and substance, "if I want to run away, I can."